Argued and submitted June 11 final order affirmed July 5, 1991

## Peter SETO
## and Henry Kane,
### *Petitioners,*

*v.*

## TRI-COUNTY METROPOLITAN
## TRANSPORTATION DISTRICT
## OF OREGON,
### *Respondent.*

## (LUBA 91-045; SC S38056)

814 P2d 1060

Henry Kane, Beaverton, argued the cause and filed the petition *pro se* and on behalf of petitioner Seto.

Mark Greenfield, Portland, argued the cause for respondent. With him on the brief were Edward J. Sullivan and Preston Thorgrimson Shidler Gates & Ellis, Portland.

GRABER, J.

## GRABER, J.

This case concerns the siting by the Tri-County Metropolitan Transportation District of Oregon (Tri-Met)[1] of the Westside Corridor Project (the Project), the Portland metropolitan region's light rail extension. The 1991 Legislative Assembly enacted Senate Bill 573 (Or Laws 1991, ch 3) (the Act), which establishes an exclusive, speedy siting process for the Project. SB 573, §§ 1, 3. The Act places review of the Tri-Met Final Order with the Land Use Board of Appeals (LUBA) and directs that any judicial review of LUBA's decision be heard in this court, which is charged with deciding the case as expeditiously as possible. SB 573, §§ 8, 9(3). LUBA's Final Opinion and Recommendation, issued pursuant to the Act, recommended that the Tri-Met Final Order be affirmed.

Petitioners appeared before Tri-Met and before LUBA. They timely sought judicial review in this court. We affirm LUBA's decision and Tri-Met's Final Order.

The Act establishes an alternative to the usual land use siting and judicial review process, which is governed by ORS chapter 197. SB 573, §§ 1, 3. The extensive legislative preamble to the operative provisions of the Act states, among other things: The Project, at a total estimated cost of nearly $1 billion, is the largest public works project in Oregon's history. Various regional and state governmental bodies have identified the Project as the region's and the state's highest transportation priority and a high air-quality priority. The Project is important to help implement significant parts of the comprehensive plans of Multnomah and Washington counties, as well as those of the cities of Portland, Hillsboro, and Beaverton. A full funding agreement with the federal Urban Mass Transportation Administration (UMTA) must be signed by September 30, 1991, in order to assure that the federal government supplies 75 percent of the funding, rather than 50 percent or less, a difference of about $227 million. The usual process for local land use decisions and for administrative and judicial review would extend well beyond September 30, 1991. Final resolution of the land use issues must be accomplished by July 31, 1991, if the agreement with UMTA is to be signed by September 30, 1991.

---

[1] Tri-Met is a special purpose district created pursuant to ORS chapter 267.

The enactment itself succinctly recapitulates those points and adds a legislative finding that a failure to obtain maximum federal funding would "seriously impair the viability" of the Project, with the attendant adverse consequences. SB 573, § 1(1). The law further provides that "[t]he Legislative Assembly deems the procedures and requirements provided for in this Act, under the unique circumstances of the Westside Corridor Project, to be equivalent in spirit and substance to the land use procedures that otherwise would be applicable." SB 573, § 1(3).

A brief description of the process established by the Act will provide necessary background for understanding the legal issues that petitioners raise. The first step in the siting process was for the Land Conservation and Development Commission (LCDC) to establish criteria for Tri-Met to use in making decisions on the light rail route, associated facilities, and highway improvements. SB 573, § 4. LCDC issued an order establishing criteria. Its order was subject to direct review in this court, SB 573, § 5, but no petition for review was filed. Tri-Met then went through a process to apply LCDC's criteria, resulting in a Final Order adopted April 12, 1991. *See* SB 573, § 6 (describing Tri-Met's process).

All affected governmental entities must amend their land use plans and regulations to make them consistent with the Tri-Met Final Order and must issue necessary and consistent construction permits. SB 573, § 7(1) and (2). Those conforming acts "shall not be reviewable by any court or agency." SB 573, § 7(3). In addition, any modifications to the Tri-Met Final Order necessitated by federal requirements, such as adoption of a final environmental impact statement, will not be subject to judicial or administrative review. SB 573, § 11.

LUBA reviewed the Tri-Met Final Order. That review was exclusive and superseded, for the purposes of the Project, other laws relating to review of land use or other Tri-Met decisions. SB 573, § 8(1). In order to have standing to seek LUBA review, a petitioner had to have appeared before Tri-Met and either "resid[e] or own[] property within sight or sound of the project, or [be] adversely affected economically in excess of $10,000 in value." SB 573, § 8(3).

LUBA's decision was required to "be in the form of a recommendation in the [Supreme Court] that the [Tri-Met] final order be affirmed or remanded." SB 573, § 8(11). LUBA was required to recommend affirmance of all portions of the Tri-Met Final Order for which it did not recommend remand. SB 573, § 8(12)(b). Remand was proper only if Tri-Met improperly construed the LCDC criteria, exceeded its statutory or constitutional authority, or made a decision not supported by substantial evidence in the whole record. SB 573, § 8(12)(a). LUBA issued its decision in the form of a "Final Opinion and Recommendation to the Supreme Court." The legislature has directed us to affirm or remand the Tri-Met Final Order, in whole or in part, based on the same standards of review that applied to LUBA's review. SB 573, § 9(4).

Before deciding petitioners' claims of error, we address three procedural matters. Tri-Met contends, first, that petitioner Kane lacked standing to appeal Tri-Met's Final Order to LUBA. Tri-Met does not challenge petitioner Seto's standing. The challenge to petitioner Kane's standing is material nonetheless, because he made certain claims that Seto did not.

LUBA was satisfied that Kane had demonstrated standing under the statutory criteria, SB 573, § 8(3). We need not detail the evidence or Tri-Met's arguments concerning it. It is sufficient for us to say that we have reviewed the record and considered Tri-Met's arguments and that we cannot conclude that LUBA was wrong as a matter of law in deciding that Kane has standing.

Tri-Met also asserts that LUBA ruled on issues that petitioners had not raised adequately in their brief to LUBA. *See* SB 573, § 8(5) and (9) (assignments of error must be "set out in detail" and comply with the Oregon Rules of Appellate Procedure). Petitioners in this court must state "why the court should not accept [LUBA's] recommendation." SB 573, § 9(1). Just as in our review of a Court of Appeals decision, we may reach all claims of error addressed by the lower tribunal, even if the issue was not properly raised below. *See* ORAP 9.20(2) (Supreme Court may consider issues that were before Court of Appeals); *State v. Lutz,* 306 Or 499, 502, 760 P2d 249 (1988) (Supreme Court may decide issues of law that Court of

Appeals decided, even if not preserved). We will consider petitioners' challenges to all issues addressed by LUBA.

■ Tri-Met's final procedural objection is that petitioners introduced new issues in their briefing to this court and that the issues are not, therefore, properly subject to our review. Petitioners' briefs do raise contentions not raised before LUBA. Those new contentions are: (1) that the time deadlines in the Act generally are so short that they deprive petitioners of due process of law,[2] and (2) that the Act violates Article IV, section 23, of the Oregon Constitution.[3] We agree with Tri-Met that those issues are not subject to review, because they were not raised within the time or in the manner required by the Act. SB 573, §§ 8(5), 8(9), and 9(1).

The briefs and motions that petitioners filed with LUBA did not even hint at the deadlines issue. It appeared for the first time in petitioners' "Memorandum of Objections" to LUBA's opinion, filed in this court. That Memorandum of Objections, however, was limited by law to stating "why the court should not accept [LUBA's] recommendation," SB 573, § 9(1), which in this case does not address the deadlines issue, because it was not raised before LUBA. Moreover, petitioners failed to comply with the requirements of SB 573 and the Oregon Rules of Appellate Procedure with respect to raising an issue before LUBA. *See* SB 573, § 8(5), (9) (requirements that the notice of intent to appeal and the petitioner's brief state the basis for the petitioner's claims of error); ORAP 5.45 (requirement of assignments of error, incorporated by SB 573, § 8(9)). Petitioner Kane adverted to the deadlines issue in his written testimony submitted to Tri-Met and thus *could have* raised the issue to LUBA. *See* SB 573, § 8(4) (precluding review of an issue if it is not raised or is not raised with

---

[2] The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides:

"No State * * * shall * * * deprive any person of life, liberty, or property, without due process of law * * *."

[3] Article IV, section 23, of the Oregon Constitution provides in part:

"The Legislative Assembly, shall not pass special or local laws, in any of the following enumerated cases, that is to say:

"* * * * *

"For laying, opening, and working on highways, and for the election, or appointment of supervisors[.]"

"sufficient specificity" before Tri-Met). For whatever reason, however, he *did not* in fact raise the issue before LUBA. In view of the statutory directive to consider only those issues raised before LUBA, Kane's failure to raise the deadlines issue there results in our decision not to consider it here.[4]

Petitioners' first reference to Article IV, section 23, came even later in the process. A member of this court asked a question about Article IV, section 23, at oral argument. Thereafter, petitioners filed a supplemental brief, discussing that provision for the first time. For the same reasons that we decline to consider the deadlines question, we decline to consider the belated constitutional question.

■    We turn now to the merits of the arguments that LUBA addressed and that petitioners renew here. Petitioners' first assignment of error is that SB 573 is unconstitutional, because it deprives the affected local governments of their Home Rule rights under the Oregon Constitution,[5] of equal privileges or immunities under the Oregon Constitution,[6]

---

[4] To the extent that petitioners argue that the deadlines following LUBA's decision are too short, they have showed no prejudice. They met all applicable deadlines in this court and reasserted all issues that they asserted before LUBA.

[5] Article XI, section 2, of the Oregon Constitution provides in part:

"The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon."

Article VI, section 10, of the Oregon Constitution provides in part:

"The Legislative Assembly shall provide by law a method whereby the legal voters of any county, by majority vote of such voters voting thereon at any legally called election, may adopt, amend, revise or repeal a county charter. A county charter may provide for the exercise by the county of authority over matters of county concern. Local improvements shall be financed only by taxes, assessments or charges imposed on benefitted property, unless otherwise provided by law or charter. A county charter shall prescribe the organization of the county government and shall provide directly, or by its authority, for the number, election or appointment, qualifications, tenure, compensation, powers and duties of such officers as the county deems necessary. * * * The initiative and referendum powers reserved to the people by this Constitution hereby are further reserved to the legal voters of every county relative to the adoption, amendment, revision or repeal of a county charter and to legislation passed by counties which have adopted such a charter[.]"

[6] Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

and of equal protection under the United States Constitution.[7]

With respect to Home Rule, petitioners note that the construction of the Project directly affects a geographic area containing five local governments. Petitioners assert that matters originally committed to those local governments under ORS chapter 197, *i.e.,* adoption of comprehensive land use plan amendments, have been effectively reallocated to Tri-Met by SB 573 for purposes of the Project. That assertion is true, of course, but the exercise of state authority, even if it were on a subject of local interest and activity, does not necessarily violate constitutional Home Rule provisions.

This court recently reviewed the somewhat tortured path of the law of Home Rule and reiterated the holding of *LaGrande/Astoria v. PERB,* 281 Or 137, 156, 576 P2d 1204 (1978), that the essential focus of the Home Rule provisions is that the "form and structure of local governments is protected from most state interference." *Mid-County Future Alternatives v. City of Portland,* 310 Or 152, 161, 795 P2d 541 (1990). Petitioners concede, and we agree, that "[t]he form and structure of the governments of the five adversely affected public bodies is not at issue."

The *LaGrande/Astoria* case also held that "a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local government's freedom to choose its own political form." 281 Or at 156. Accordingly, we examine (1) whether SB 573 is "a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state," which is intended to prevail over any contrary policy that may be preferred by the affected local governments, and (2) whether the law affects the local governments' freedom to choose their own political form.

---

[7] The Fourteenth Amendment to the United States Constitution provides, in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * * nor deny to any person within its jurisdiction the equal protection of the laws."

■ First, SB 573 plainly is addressed to the legitimate state objectives recognized in *LaGrande/Astoria*. Land use regulation is addressed primarily to substantive social, economic, or other regulatory objectives of the state. *See, e.g.,* ORS 197.005 (need for statewide land-use planning program); ORS 197.835 (requiring local comprehensive plans and land-use regulations to comply with LCDC's statewide goals and rules). Moreover, this particular transportation project has significant regional and statewide economic and social consequences. The non-federal funding for the Project is both regional and statewide: The voters in the Tri-Met district have approved a $125 million bond measure (increasing local property taxes) to fund the Project, and the state legislature has passed a law authorizing a revenue bond issue of up to $115 million to be financed and repaid by statewide lottery funds. SB 573 (preamble); HB 2128.

The state Department of Transportation has identified the Project as its highest transportation priority; the state Department of Environmental Quality has identified the Project as a high regional air-quality priority; and the state Department of Energy has identified the Project as one of its emission-reduction strategies for the Portland area. SB 573 (preamble). In House Bill 2128, which the 1991 Legislative Assembly just enacted, the legislature finds that the development, acquisition, and construction of light rail systems — including the Project:

"will accomplish the purpose of creating jobs and furthering economic development in Oregon, by, among other advantages:

"(a) Providing an important element of the public infrastructure that provides the basic framework for continuing and expanding economic activity in this state[.]" HB 2128, § 1(1).

Portland is the largest city in the state and a center of state economic activity. Its metropolitan area is geographically and strategically important with respect to the economic development and resources of the state. *See East St. Johns Shingle Co. v. Portland,* 195 Or 505, 531, 246 P2d 554 (1952) ("We take notice that the city of Portland is one of the great inland ports of the world and so geographically and strategically located with reference to the economic development and

natural resources of the state of Oregon and the northwest that its continued expansion in population might well have been foreseen in 1934.'').

Petitioners, for their part, have pointed to no circumstance that would suggest that the Project is not geared primarily to accomplishing legitimate state economic, social, and regulatory objectives. We conclude that SB 573 is a general law addressed primarily to those objectives. Even if there were contrary policies preferred by the affected local governments,[8] SB 573 is intended to prevail over them. *See* SB 573, §§ 1, 3 (establishing an exclusive siting process); § 7(1) and (2) (affected local government entities must amend their land use plans and regulations to make them consistent with the Tri-Met Final Order and must issue construction permits).

Turning to the second part of the *LaGrande/Astoria* analysis, petitioners agree that SB 573 does not interfere with the local governments' choice of their form of government. Accordingly, SB 573 does not implicate or offend the Home Rule provisions of the Oregon Constitution.

Petitioners next contend that SB 573 violates the equal privileges or immunities clause of Article I, section 20, of the Oregon Constitution and the Equal Protection Clause of the Fourteenth Amendment. Petitioners assert that ''ORS chapter 197 gives local public bodies the power to amend their Comprehensive Plans and their citizens power to appeal comprehensive plan amendments'' and that SB 573, section 7(3), unconstitutionally deprives the local governments and citizenry in the five affected localities of those statutory rights. Petitioners similarly challenge the provision of the Act that places any later modifications to the Tri-Met Final Order, necessitated by federal regulations, beyond administrative or judicial review. SB 573, § 11.

Petitioners' equal privileges and equal protection claims thus fall into two categories. First, petitioners claim

---

[8] Petitioners have identified no contrary policy preferred by the affected local governments. Indeed, the legislature states that the Project is important to the implementation of significant parts of the affected local governments' comprehensive plans and that the affected governments are ''united in seeking federal funding'' for the Project. SB 573, § 1(1) and preamble.

that possible future events would be unconstitutional. Second, they claim that the Act, pursuant to which Tri-Met and LUBA acted, is presently unconstitutional on its face.

With respect to the first category, the claims are not cognizable here and now, because they overstep the statutorily defined scope of this judicial proceeding. This judicial proceeding is a limited one. We may review only the extant Tri-Met Final Order. We may remand that order only if Tri-Met improperly construed the LCDC criteria, exceeded its lawful authority, or made a decision not supported by substantial evidence. SB 573, §§ 8(12)(a), 9(4). Petitioners' future-oriented equal privileges and equal protection contentions are speculative. The amending acts about which they complain may or may not occur. Furthermore, if amendments are made, they will be made *after* the Final Order. Whether or not the preclusion of review of *later* amending acts is constitutional, we cannot remand the Final Order in *this* proceeding, because remand may be based only on a conclusion that Tri-Met has exceeded its lawful authority in its actions leading up to and including the adoption of the Final Order.

■ Petitioners' present equal privileges and equal protection claims are twofold. First, petitioners assert that local governments are deprived of a right or privilege. Second, they contend that they personally are deprived of a right or privilege.

■ Under both state and federal law, petitioners as individuals lack standing to raise the claim that a local government is deprived of a right or privilege. *See Franchise Tax Bd. v. Alcan Aluminum, Ltd.*, 493 US 331, ___, 110 S Ct 661, 665, 107 L Ed 2d 696, 703-04 (1990) (generally, under federal law, a plaintiff may assert only his or her own legal rights and not those of another); *Kelley v. Silver*, 25 Or App 441, 452, 549 P2d 1134 (1976) (similar in context of state administrative appeal). Petitioners are not a local government. Moreover, cities and counties are not "citizens" or a "class of citizens" for purposes of Article I, section 20. *Hale v. Port of Portland*, 308 Or 508, 524, 783 P2d 506 (1989).

■ Petitioners' claim that they personally were deprived of a right or privilege is without merit. The geographical

classification of which they complain is permissible under the constitutional provisions that petitioners cite. Large-scale public works projects are an obviously legitimate object of state legislation, as is land use more generally. The geographical classification inherent in any project-specific public works legislation is tested by whether the legislature had authority to act and whether the classification has a rational basis. *See Sealey v. Hicks,* 309 Or 387, 397-98, 788 P2d 435 (1990) (rational basis test applied to products liability statute); *State v. Clark,* 291 Or 231, 241, 630 P2d 810, *cert den* 454 US 1084 (1981) (rational basis test described for state-law geographic classifications). As discussed above, the legislature had authority to act, and its classification has a rational basis. This court has repeatedly upheld rational geographical classifications in state legislation in the face of state constitutional equal privileges or immunities challenges and federal equal protection challenges. *See State v. Clark, supra,* 291 Or at 241 (citing cases with approval). We do so again in this case.

■ Petitioners also assert that the standing requirements within SB 573 are arbitrary and capricious and show an unconstitutional legislative purpose to discourage and limit objections to Tri-Met's Final Order. That argument is framed as a due process challenge to the Act under the Fourteenth Amendment. Petitioners have complied with the Act's requirements and have demonstrated no prejudice to themselves from the standing provisions of which they complain. No others are here to complain that they were denied standing to challenge the Tri-Met Final Order. Accordingly, petitioners have demonstrated no violation of their constitutional rights on account of the standing requirements.

■ Petitioners' second assignment of error asserts that Tri-Met exceeded its statutory authority, because it did not hold a public hearing on the Supplemental Draft Environmental Impact Statement (SDEIS). Once again, under the statutory scheme enacted for this specific Project, this court may remand the Tri-Met Final Order only under certain express conditions, one of which is Tri-Met's having "exceeded its statutory * * * authority." SB 573, § 8(12)(a)(B). Petitioners state that federal law required a hearing. LUBA concluded that, even if a hearing was required by federal law and did not yet occur, that is not a basis to

challenge the Tri-Met Final Order under the Act. LUBA relied on Section 3(1), which provides that, "[n]otwithstanding any other provision of law, the procedures and requirements provided for in this Act shall be the only land use procedures and requirements *to which the following decisions shall be subject:* [light rail route and associated facilities and highway improvements]." SB 573, § 3(1) (emphasis added). Those enumerated decisions also define the *entire scope* of the Tri-Met Final Order. SB 573, § 2(9).

We agree with LUBA that the review provided for in the Act is limited to whether Tri-Met acted in accordance with its statutory authority *under the alternative land use siting process established by the Act* in issuing its Final Order. There is no requirement in the Act that Tri-Met, in the course of considering and adopting its Final Order, hold a public hearing on the SDEIS.

Our conclusion is supported both by the clearly defined scope of the Tri-Met Final Order subject to review, which does not include the SDEIS process, and by the special purpose of the Act, which is to establish an *alternative land use siting process* that will result in a Final Order and expeditious judicial review of that order. To introduce extraneous challenges into the judicial review process for the Final Order would serve only to thwart the legislative purpose of a prompt and focused resolution. It would also inexplicably permit remand for a defect that *does not* relate to the Final Order. The failure to hold an SDEIS hearing before adopting a Final Order under the Act is not a cognizable claim of error in this case.

Petitioners' third assignment of error is that Tri-Met failed to comply with the applicable statutes calling for a public hearing, in that petitioners did not have an adequate opportunity to present their views to Tri-Met. They do not dispute that a public hearing occurred. Neither do they assert that they were prevented from speaking on the same basis as other citizens (three minutes each) or that they could not submit written testimony. Petitioners did, in fact, speak at the hearing and did submit extensive written testimony. They have shown neither a failure to comply with the relevant statutes nor prejudice.

Petitioners' fourth assignment of error raises the general issue of Tri-Met's compliance with LCDC criterion #3. LCDC criterion #3 provides that Tri-Met shall:

> "Identify adverse economic, social and traffic impacts on affected residential, commercial, and industrial neighborhoods, and consider mitigation measures to reduce those impacts which could be imposed as conditions of approval during the [NEPA] process or by affected local governments during the permitting process.

> "A. Provide for highway improvements that facilitate efficient traffic flow, balancing the need to improve the highway system with the need to protect affected residential, commercial, and industrial neighborhoods and, in the City of Portland, the need to protect the scenic qualities of the Sunset Canyon.

> "B. Provide for a light rail alignment, light rail stations, and park-and-ride lot, balancing the need to protect affected residential, commercial, and industrial neighborhoods with the need for proximity and connections to present or planned residential, employment and recreational areas that are capable of enhancing transit ridership. Park-and-ride lots shall not be located within the central business district of the City of Beaverton or within the boundaries established by the Downtown Parking and Circulation Policy of the City of Portland."

Petitioners argue generally that Tri-Met was required to *adopt* mitigation measures in its Final Order.

We agree with LUBA's interpretation and application of LCDC criterion #3. We quote from its Final Opinion and Recommendation:

> "The first sentence of the criterion simply requires that Tri-Met *identify* specified types of adverse impacts and *consider* mitigation measures which could be imposed later in the NEPA or local permitting process. Therefore, although adverse effects must be identified in Tri-Met's decision, there is no requirement that such adverse effects be avoided, eliminated or even reduced to any specific degree. * * *

> "* * * * *

> "Tri-Met adopted findings which explain the method it used to identify adverse impacts of the proposed at-grade crossings. Tri-Met also adopted findings explaining why,

applying that method, the at-grade crossings in Beaverton will result in a LOS [level-of-service rating] that does not cause adverse impacts. For the one intersection where adverse impacts may occur, Tri-Met identifies and discusses mitigation options. In view of petitioners' failure to specifically challenge any of these findings, we believe they are adequate to demonstrate compliance with LCDC Criterion No. 3." (Emphasis in original; citation omitted.)

Petitioners' fifth assignment of error asserts that Tri-Met was required to adopt measures to mitigate a particular adverse effect. As the discussion of the fourth assignment of error holds, Tri-Met was not required in its Final Order to *adopt* mitigation measures. Accordingly, the claim of error fails.

Petitioners' sixth assignment of error asserts that Tri-Met did not adopt measures to mitigate allegedly severe adverse geological conditions affecting a proposed long tunnel and tunnel portals that will be built as a part of the Project. LCDC criterion #5 provides:

"Identify landslide areas, areas of severe erosion potential, areas subject to earthquake damage, and lands within the 100-year floodplain. Demonstrate that adverse impacts to persons or property can be reduced or mitigated through design or construction techniques which could be imposed as conditions of approval during the NEPA process or by local governments during the permitting process."

Like LCDC criterion #3, LCDC criterion #5 does not require Tri-Met in its Final Order to *adopt* mitigation measures. Instead, it requires Tri-Met to *identify* certain potential geological problems and to *demonstrate* that adverse impacts can be reduced in the future. Tri-Met made extensive findings concerning those two requirements, none of which petitioners challenge as unsupported by substantial evidence. Thus, the record supports a conclusion that Tri-Met complied with the mandates to identify the specified potential geological problems and to demonstrate the potential for adequate mitigation in future processes.

Petitioners' seventh and eighth assignments of error are essentially variants of the fourth assignment of error with

respect to other specified adverse impacts.[9] We conclude that those assignments likewise provide no basis for remanding the Tri-Met Final Order.

In connection with assignments of error four through eight, petitioners also claim: (1) that Tri-Met failed to "*consider* mitigation measures*"* to reduce certain specified adverse impacts, in violation of LCDC criterion #3, and (2) that Tri-Met failed to "[*d*]*emonstrate* that [other specified] adverse impacts * * * can be reduced or mitigated*"* by later-imposed conditions of approval, in violation of LCDC criterion #5. (Emphasis added.) The requirements of consideration and demonstration are not tantamount to a requirement of adoption. Tri-Met's Final Order incorporates 189 pages of findings of fact and conclusions of law. Our review of the Final Order leads us to conclude that Tri-Met did, in fact, comply with LCDC criteria #3 and #5 as they relate to petitioners' specific claims of adverse impacts. We might agree with petitioners that a statement merely identifying a potential adverse impact, without more, might not satisfy the LCDC mandates. But this record demonstrates that Tri-Met did more. Tri-Met concluded that its plan was feasible and in compliance with the LCDC criteria, including the potential for adequate mitigation measures where they ultimately might be deemed advisable or necessary. We find no error requiring remand for the asserted failure to comply with the LCDC criteria.

The appellate judgment in this case shall issue pursuant to the provisions of ORAP 11.30(10).[10]

---

[9] Petitioners' eighth assignment of error appears to raise a host of issues, most of which may be characterized as particularized variants of the fourth assignment of error. Those that cannot be so characterized have also been considered, and we conclude that they lack merit. *See* LUBA Final Opinion and Recommendation at pp 30-35 (discussing claims).

[10] ORAP 11.30(10) provides:

"Notwithstanding Rule 9.25(1) and Rule 14.05, a decision certifying a ballot title or dismissing a ballot title proceeding will become effective when the appellate judgment issues. The administrator shall issue the appellate judgment 10 days after the filing date of the decision, unless a petition for reconsideration is filed with and actually received by the Administrator within 7 days after the filing date of the decision. A timely petition for reconsideration will toll issuance of the appellate judgment until the court acts on all timely petitions for reconsideration. If the court denies reconsideration, the Administrator shall issue the appellate judgment the next judicial day after the denial of all timely filed petitions for reconsideration."

The Final Opinion and Recommendation of the Land Use Board of Appeals is affirmed. The Final Order of the Tri-County Metropolitan Transportation District of Oregon is affirmed.