Argued and submitted November 30, 1994, reversed and remanded for reconsideration January 4, petition for review denied March 21, 1995 (320 Or 598)

# TRI-COUNTY METROPOLITAN
# TRANSPORTATION DISTRICT,
*Petitioner,*

*v.*

# CITY OF BEAVERTON
and Henry Kane,
*Respondents.*

## (LUBA 94-002, 94-003; CA A85991)

888 P2d 74

Mark J. Greenfield and Gregory S. Hathaway argued the cause for petitioner. With them on the briefs were Timothy R. Volpert and Davis Wright Tremaine.

Mark Pilliod argued the cause and filed the brief for respondent City of Beaverton.

Respondent Henry Kane filed the brief *pro se*.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

Tri-County Metropolitan Transportation District (Tri-Met) seeks review of LUBA's order affirming one and remanding a second decision by the City of Beaverton, which imposed conditions on the city's design review approval of two segments of the Westside Corridor light rail project.

In April, 1991, Tri-Met adopted a final order pursuant to Oregon Laws 1991, chapter 3 (Senate Bill 573). The parties and LUBA refer to that order as the land use final order (LUFO) and, sometimes in this opinion, so will we. Under section 2(9) of Senate Bill 573:

" 'Final Order' means a written order or orders of the board of directors of the district deciding:

"(a)   The light rail route for the project and project extension, including but not limited to the light rail alignments;

"(b)   The location of associated light rail facilities for the project and project extension, including but not limited to the station and lot locations; and

"(c)   The highway improvements."

Tri-Met's final order was affirmed by the Supreme Court in *Seto v. Tri-County Metro. Transportation Dist.*, 311 Or 456, 814 P2d 1060 (1991). The court's opinion describes the general purposes of Senate Bill 573:

"The Act establishes an alternative to the usual land use siting and judicial review process, which is governed by ORS chapter 197. SB 573, §§ 1, 3. The extensive legislative preamble to the operative provisions of the Act states, among other things: The Project, at a total estimated cost of nearly $1 billion, is the largest public works project in Oregon's history. Various regional and state governmental bodies have identified the Project as the region's and the state's highest transportation priority and a high air-quality priority. The Project is important to help implement significant parts of the comprehensive plans of Multnomah and Washington counties, as well as those of the cities of Portland, Hillsboro, and Beaverton. A full funding agreement with the federal Urban Mass Transportation Administration (UMTA) must be signed by September 30, 1991, in order to assure that the federal government supplies 75 percent of the funding, rather than 50 percent or less, a difference of about

$227 million. The usual process for local land use decisions and for administrative and judicial review would extend well beyond September 30, 1991. Final resolution of the land use issues must be accomplished by July 31, 1991, if the agreement with UMTA is to be signed by September 30, 1991.

"The enactment itself succinctly recapitulates those points and adds a legislative finding that a failure to obtain maximum federal funding would 'seriously impair the viability' of the Project, with the attendant adverse consequences. SB 573, § 1(1). The law further provides that '[t]he Legislative Assembly deems the procedures and requirements provided for in this Act, under the unique circumstances of the Westside Corridor Project, to be equivalent in spirit and substance to the land use procedures that otherwise would be applicable.' SB 573, § 1(3)." 311 Or at 358-59.

In summary, the objectives of Senate Bill 573 are to achieve the completion of the project and assure federal funding. In pursuit of those aims, the bill provides for more expeditious land use decision making and review and less exacting criteria in the decision and review process than apply generally under ORS chapter 197.

The LUFO contained references to later procedures by which "mitigation measures" directed at adverse impacts would be addressed. Among the procedures to which it referred was the completion of the final environmental impact statement (FEIS) required by the federal regulatory authority. However, the LUFO itself did not refer directly to specific mitigation measures. According to LUBA, the FEIS committed Tri-Met to erect an esplanade and an "enhanced trackway" on the highway segment involved in LUBA case number 94-002.[1] However, Tri-Met subsequently entered into a full funding agreement (FFA) with the federal agency, which required that both the esplanade and enhanced trackway measures be "deferred."

In case number 94-002, Beaverton required the esplanade and the enhanced trackway as approval conditions. In connection with the separate highway segment involved in LUBA case number 94-003, the city conditioned its approval on Tri-Met's including rest rooms and drinking fountains at a

---

[1] Tri-Met does not agree that it was committed to the esplanade under the FEIS. We need not decide that issue in this proceeding.

transit center. LUBA affirmed the city's decision in the first case and, concluding that the city's findings in the second were inadequate, LUBA remanded that decision. Tri-Met asks us to "reverse LUBA's order with instructions either to reverse the decisions of the City of Beaverton or require Beaverton to strike the challenged conditions."

■■ Initially, Beaverton argues that LUBA erred by not dismissing Tri-Met's appeal. The essence of the city's arguments is that its decisions were limited land use decisions and, under the limited bases for the review of such decisions, *see* ORS 197.828, none of Tri-Met's arguments can warrant reversal. LUBA rejected that argument, concluding *inter alia* that the special review provisions of Senate Bill 573 are equally applicable regardless of whether the final order would come within the definition of a land use decision or a limited one if the review provisions of ORS chapter 197 controlled. The city does not convince us otherwise. Senate Bill 573 contains many provisions, including sections 7(1)(b) and 7(4), which apply specifically here, that clearly manifest the legislature's intention that the bill's own review provisions and not the general ones in ORS chapter 197 govern in cases subject to the bill. We are also unpersuaded by the city's contention that, as material here, section 7 and other provisions of the bill parallel the review provisions for limited land use decisions in ORS chapter 197. As LUBA noted, the distinction between land use and limited land use decisions had not been established by the legislature until after Senate Bill 573 was enacted. *See* Or Laws 1991, ch 817. We reject the jurisdictional argument and turn to the merits.

The decisive statutory provisions are sections 7(1) and 7(4) of Senate Bill 573. They provide:

"(1) The state and all counties, cities, special districts and political subdivisions shall:

"(a) Amend their comprehensive or functional plans, including public facility plans, and their land use regulations to the extent necessary to make them consistent with a final order; and

"(b) Issue the appropriate permits, licenses and certificates necessary for the construction of the project or project extension consistent with a final order. Permits, licenses and

certificates may be subject to reasonable and necessary conditions of approval, but may not, either by themselves or cumulatively, prevent the implementation of a final order.

"* * * * *

"(4) Permit, license and certificate decisions under paragraph (b) of subsection (1) of this section may be the subject of administrative and judicial review as provided by law. However, determinations on review shall not prevent the implementation of a final order."

LUBA began its analysis of case number 94-002 by interpreting section 7(1)(b) as follows:

"The first sentence of Section 7(1)(b) requires the city to approve permits for construction of the Project *consistent with the LUFO*. The second sentence of Section 7(1)(b) limits a local government's authority to impose conditions on such permits to conditions which are reasonable and necessary and *will not prevent the implementation of the LUFO*. Section 7(1)(b) does not expressly address situations where what is proposed in a permit application is *inconsistent* with the LUFO. In such situations, imposition of an appropriate condition is *necessary* for consistency with the LUFO, the local government is *required* to impose such a condition in approving the permit application, and the limitations in the second sentence of Section 7(1)(b) do not apply. Therefore, we agree with the city that if the disputed conditions are *required by the LUFO*, they may be imposed irrespective of the limitations expressed in the second sentence of Section 7(1)(b).

"However, if the disputed conditions are *not* required by the LUFO, then their imposition is subject to the limitations stated in the second sentence of Section 7(1)(b). Because the second sentence of Section 7(1)(b) imposes limitations on *the city's* authority to adopt conditions of approval, we agree with Tri-Met that the city has the burden of demonstrating that any conditions which are not required by the LUFO comply with these limitations." (Emphasis in original.)

LUBA then reasoned that, although the esplanade and enhanced trackway were not mentioned in the LUFO itself, they were included in the FEIS, and the LUFO incorporated the FEIS by reference. Accordingly, LUBA concluded that those two mitigation measures were to be deemed part of the LUFO. Next, LUBA concluded that the fact that the esplanade and enhancements were on the FFA deferral list

was irrelevant, because the FFA was a contract between Tri-Met and the federal agency, and was not binding on the city. The net result of LUBA's reasoning was that the city could attach the two conditions of approval "irrespective of the limitations expressed in the second sentence of Section 7(1)(b)."

In its first three assignments, Tri-Met assails virtually every turn of the reasoning in LUBA's opinion that we have described. Although we consider that some of those turns are for LUBA to navigate once again on remand, we agree in the main with Tri-Met as far as we find it appropriate for us to go in this opinion.

■    At the outset, we do not agree with LUBA that the phrase "consistent with a final order" in section 7(1)(b) means that a permit or other approval can be issued only if *all of the contents* of the LUFO are found to have been in some way satisfied. The phrase follows the words "permits, licenses and certificates necessary for the construction of the project or project extension." The clear textual meaning of the phrase, which the context of the bill supports, is that local governments must grant necessary approvals if the *project construction* for which permission is sought is consistent with the final order.

■    We are also unable to draw the sharp line that LUBA does between the two sentences of the subsection. It may be that, if the proposed construction itself is not consistent with the final order, the local government is not required to issue an approval. However, neither sentence of the subsection supports LUBA's understanding that, if consistency with the LUFO is lacking, conditions of approval may be attached without regard for whether they are reasonable and necessary. Conceivably, the fact that a condition is directly or indirectly contemplated by the LUFO may be a factor to weigh in deciding whether it is reasonable and necessary. However, the statute does not allow a condition to be attached without inquiry into its reasonableness and necessity.

■    Similarly, if a measure is set forth in the FEIS, that may have bearing on whether it can be required as a reasonable and necessary condition, whether or not it is also expressly mentioned in the LUFO. However, if the same

measure is subject to mandatory deferral in the agreement between Tri-Met and the authoritative federal agency, that, too, is pertinent to whether it is reasonable and necessary for a local government to make the measure a condition of approving a permit, license or certificate under section 7(1)(b).

■ As Tri-Met contends, Senate Bill 573 is a measure that was designed to promote programmatic objectives at the expense of usual land use and other requirements. LUBA's broad reading of section 7(1)(b) is at odds with its text and with the statutory context. Section 7(4) is particularly illustrative. It provides that, like the local conditions, the administrative and judicial review process itself is subordinate to the needs of project implementation. By its own terms and against its contextual background, section 7(1)(b) cannot be read or applied in the way LUBA did. Stated summarily, we agree with Tri-Met that LUBA effectively treated Senate Bill 573 as giving it the same scope of and subjects to review as ORS chapter 197 does. However, one of the bill's overriding aims was to narrow those aspects of the review process substantially. We remand LUBA's order in case number 94-002 for reconsideration in the light of this opinion.

Tri-Met's remaining assignment takes issue with the following comments that LUBA made in its remand of case number 94-003:

"Tri-Met argues that restrooms and drinking fountains are not 'necessary,' as that term is used in Section 7(1)(b), if the Project can be completed without them. *1000 Friends of Oregon v. LCDC [(Lane Co.)]*, 83 Or App 278, 282-83, 731 P2d 457 (1987)[, *aff'd in part, rev'd in part*, 305 Or 384, 752 P2d 271 (1988)] ('necessary' means 'cannot be done without'). The city argues that Tri-Met's interpretation improperly adds the term 'to the project' to the word necessary. The city contends that, as used in Section 7(1)(b), a 'necessary' condition is a condition required for the Project to meet applicable criteria of the city's plan and code. The city points out that Section 1(3) of SB 573 states the legislature 'reaffirms its commitment to the provisions of ORS 197.010 and to the partnership between the local government and the state in carrying out [its] provisions.' One of these provisions is that coordinated comprehensive plans 'shall be prepared to assure that all public actions are consistent and coordinated

with the policies expressed through the comprehensive plans.' ORS 197.010(1)(d).

"The final provision of Section 7(1)(b) states that a condition may not be imposed if it would prevent implementation of the LUFO and, therefore, implementation of the Project. If Tri-Met's interpretation of 'necessary' as meaning essential to completion of the Project were correct, there would be no need to include in the statute a prohibition against conditions which would *prevent* completion of the Project. We believe the city's interpretation of the term 'necessary' in Section 7(1)(b) is correct. Under this interpretation of Section 7(1)(b), even if a condition is 'reasonable and necessary' to satisfying applicable city plan and code provisions, it could not be imposed if by itself, or together with other conditions, it would prevent implementation of the Project." (Footnote omitted; emphasis in original.)

■ For largely the same reasons that we disagreed with the other aspect of LUBA's order, we also disagree with this one. As Tri-Met again suggests, LUBA's reading of the statute is premised on the understanding that it is a land use "business as usual" provision, when its whole purpose is the opposite. Although the bill contains precatory language on which LUBA relies relating to the ongoing legislative commitment to the usual land use planning process, the substantive provisions of the bill are clearly to the effect that that process is superseded for purposes of this project. The most relevant context for determining whether the reasonable and necessary test in section 7(1)(b) refers to project implementation and impacts, or to the enforcement of all provisions of local land use legislation, is to be found in section 7(1)(a). That provision requires local governments to amend their plans and regulations to achieve consistency with a Tri-Met final order, and the provision therefore differs diametrically from the usual requirement that particular decisions be consistent with existing plans and regulations. Taken with the rest of the bill, section 7(1)(a) leaves no doubt as to what the legislature perceived to be the horse and the cart in Senate Bill 573. The reasonable and necessary test applies to conditions that are related to or necessitated by the project, but the bill does not permit conditions of a kind that are designed to further unrelated land use objectives of local plans and regulations.

LUBA's point that it would not have been necessary for section 7(1)(b) to specifically protect project implementation if Tri-Met's and our interpretation were correct is simply an exercise in second guessing the legislature. Nothing prevents that body from erecting two shields instead of one to protect the same target. We conclude that LUBA's misinterpretation of the referent of the reasonable and necessary test could have affected its disposition of case number 94-003, and we remand it as well as case number 94-002 to LUBA for further consideration under this opinion.

Reversed and remanded for reconsideration in LUBA case numbers 94-002 and 94-003.