Argued and submitted July 12, reversed on appeal; affirmed on cross-appeal
October 13, 1999

Zachary Daniel WITHERS,
Kiel Alan Peck and Seth Jeremy Ring,
*Respondents - Cross-Appellants,*

*v.*

STATE OF OREGON,
*Appellant - Cross-Respondent.*

(94CV0074TM)

Jennifer Ann SOLMAN,
Jennifer Renee Surdyk
and Briana Jane Swanlund Hinchliffe,
*Respondents - Cross-Appellants,*

*v.*

STATE OF OREGON,
*Appellant - Cross-Respondent.*

(96CV0623AB; CA A97204)

987 P2d 1247

Robert M. Atkinson, Assistant Attorney General, argued the cause for appellant - cross-respondent. On the brief were Rives Kistler, Assistant Attorney General, Hardy Myers,

Attorney General, and Michael D. Reynolds, Solicitor General; on the reply brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Robert M. Atkinson, Assistant Attorney General.

William F. Gary argued the cause for respondents - cross-appellants. With him on the brief was Harrang Long Gary Rudnick, P.C.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

Haselton, J., concurring.

## DE MUNIZ, P. J.

The state appeals from an adverse decision in a declaratory judgment proceeding in which plaintiffs petitioned for and received supplemental relief after being denied relief in *Withers v. State of Oregon*, 133 Or App 377, 891 P2d 675, *rev den* 321 Or 284 (1995). In the present proceeding, the trial court held that the state violated Article I, section 20, of the Oregon Constitution,[1] by failing to implement fully legislative changes intended to bring about equitable funding of secondary schools in Oregon. Consequently, the trial court ruled that Or Laws 1995, chapter 649, was unconstitutional. Plaintiffs cross-appeal from the trial court's denial of their motion for attorney fees. For the following reasons, we reverse on appeal and therefore do not reach the issue raised on cross-appeal.

Plaintiffs[2] initiated this proceeding for declaratory relief in 1994, arguing that the state's failure to implement a system of equitable secondary school funding throughout the state violated Article I, section 20. The trial court disagreed and denied plaintiffs the relief they sought. On appeal, we concluded that the trial court was correct. To provide the background for the arguments, we review our previous decision at some length. In 1987, an amendment to the Oregon Constitution was enacted to provide a "safety net" for schools, should local property tax levies fail to provide funding at least at the level of funding from the previous year. Or Const, Art XI, § 11a. In 1991, the voters approved another constitutional amendment that phased in strict limitations on the amount of local property taxes that could be imposed on property and required the state to make up the lost funds to the schools through use of the general fund for the first five years

---

[1] Article I, section 20, of the Oregon Constitution, provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[2] Plaintiffs in the original proceeding were students in the Redmond school district. In the course of the proceeding on the petition for supplemental relief, a separate case involving students from the Bend-LaPine school district was consolidated with this case. We refer to both groups generically as plaintiffs in this opinion.

after the new funding system was implemented. *Withers*, 133 Or App at 379.

In 1991, the legislature enacted ORS 327.013, which created a formula by which "school districts are to be awarded sufficient state general fund revenues so that, when those funds are combined with remaining property tax revenues, each district receives a total amount of financial support that is roughly equal on a per student basis." *Withers*, 133 Or App at 280. However, ORS 327.013 did not go into effect immediately:

"Because many districts historically were funded at levels substantially higher or lower than the new equalized level, the legislature enacted a transition mechanism. It imposed a limit on the extent to which a school district's total funding level could increase or decrease because of implementation of the formula for distributing state general fund revenues; districts whose funding levels previously were higher than what the formula would produce could suffer no reduction from prior levels, while districts with historically lower total funding levels could enjoy an increase of no more than 25 percent of the prior year's budget. Or Laws 1991, ch 780, § 4a.

"During the 1993 legislative session, the legislature retained the state school fund distribution formula largely unchanged and, once again, appropriated general fund revenues to replace property tax revenues lost under Measure 5. The legislature also amended its transition mechanism for implementation of the formula. Under the amended law, for fiscal years 1993-94 and 1994-95, no district may receive total funding amounting to less than 90 percent of what it received the previous fiscal year. In addition, for those fiscal years, no district may receive an increase in funding of more than 25 percent over what it had received the previous fiscal year. Or Laws 1993, ch 61, §§ 1(2), 2. Those districts that remained under the roughly equalized level of total funding were then entitled to an additional 'equity' grant. Or Laws 1993, ch 61, § 1(3). The transitional mechanism adopted by the legislature expires at the end of fiscal year 1994-95, after which time—barring further legislative action—all districts are to receive state general fund revenues according to the statutory distribution formula. Or Laws 1993, ch 61, §§ 1, 2." *Withers,* 133 Or App at 380-81.

Plaintiffs sought declaratory relief, arguing that the transition mechanisms that delayed the implementation of equal funding of secondary education violated Article I, section 20, of the Oregon Constitution.[3] Plaintiffs argued that the transition formula, which limited their school district to a 25 percent increase from the prior funding level, denied them educational opportunities that were available in other districts not subject to the limitation. *Id.* at 381. The state moved for judgment on the pleadings, and the trial court granted the state's motion. On appeal, plaintiffs contended that they were members of a class of students who, because of their geographical location, were denied educational opportunities. They asserted that there was no rational basis for treating them differently from students in other school districts. *Id.* at 385. We assumed, for the sake of argument, that plaintiffs constituted a true class for purposes of Article I, section 20, analysis but concluded that there was a "rational basis" for the discrimination. *Id.* at 386. We stated:

"Plaintiffs argue that the legislature cannot constitutionally adopt such a phased implementation of the funding formula. According to plaintiffs, they have a constitutional right to total funding under the [statutory] formula *now.*

"We disagree with plaintiffs. The legislature has made a considered policy choice to phase in implementation of the state school fund distribution formula over a period of time. The apparent purpose of that phased-in implementation of the funding formula is to avoid the harm that would likely result from immediate equalization of funding. In school districts that historically received higher levels of total funding, for example, immediate equalization would require substantial budget cuts, elimination of programs and the termination of teachers and other staff. Such abrupt funding changes could cripple those districts in their abilities to provide basic education services to their students. It is entirely reasonable for the legislature to provide such districts with a reasonable window within which to prepare for eventual reductions in funding and to make

---

[3] Plaintiffs made numerous other constitutional claims as well but they are not pertinent to the present appeal.

appropriate program and operational changes to accommodate those funding changes in a fashion that is less disruptive to administrators, teachers and students alike." *Id.* at 387 (emphasis in original).

We therefore concluded that the legislature's choice to implement the equal distribution formula over time had a rational basis and did not violate Article I, section 20, of the Oregon Constitution. *Id.*

The year after our decision in *Withers*, plaintiffs petitioned the trial court for supplemental relief in the same declaratory judgment action.[4] Plaintiffs alleged that, in the earlier proceeding, counsel for the state had informed the court:

"And there's no dispute that after the next school year, all the kids in this state are going to get the same amount of money on a weighted student average. They will have the equality that they've asked for in the 1995-96 school year."

Plaintiffs further alleged that the trial court's judgment on the pleadings in favor of the state indicated that

"[t]here can be no justification for permanently maintaining the funding disparity. * * *

"The state may not hold the 'richer' districts harmless forever. There must be funding equality, even if there is a negative impact for some. What [the state] calls reform in the short term can become discrimination. * * * The reason articulated by the state cannot justify a phase-in for so protracted a period that these plaintiffs substantially lose the benefit of an equitably financed education. That having been said, there is a rational basis for the brief delay the law now contemplates."

Plaintiffs asserted that the 1995 Legislature's new transition scheme unconstitutionally delayed equality in funding even further than had the previous transition scheme and was

---

[4] ORS 28.080 provides:

"Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application thereof shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith."

inconsistent with the state's assertion in the previous proceedings that funding equality was, so to speak, just around the corner. Plaintiffs again sought a declaration that the new legislative scheme delaying equal funding violated Article I, section 20, of the Oregon Constitution.

The state responded that the 1995 legislation, like the previous transition legislation, was rational. The state acknowledged that the 1995 legislation in effect continued the status quo in one respect by flat-funding the wealthier districts at the levels that they previously had enjoyed but asserted that progress nonetheless was being made toward the goal of funding equality for the poorer districts. Although the 1995 legislation removed the 25 percent "cap" on increases for districts funded under the equalization formula, the amount available for distribution under that formula was decreased by the amount earmarked for the wealthier flat-funded districts. In short, the amount of funds going to the flat-funded districts reduced the amount of money available to move the underfunded districts toward the goal of equality. *See* Or Laws 1995, ch 649. In the state's estimate, actual equality in funding was at least several more years away.

The trial court, after reviewing this background, thought the 1995 legislation differed significantly from the previous phase-in formula approved in *Withers*. The court concluded that, under the 1995 scheme, "the phase-in can no longer be called temporary and because full equity is no longer assured but is, instead, contingent on adequate revenue, the State's policy no longer meets the criteria for constitutionality."

The state appeals the trial court's decision, arguing that, just as the previous transition scheme survived the rational basis test, so does the 1995 transition scheme enacted by the legislature. For the following reasons, we agree and reverse.

We emphasize at the outset that the issue before us is a narrow one: Did the interim legislation in effect from 1995 to 1997 that continued historic funding disparities between secondary school districts violate Article I, section 20, of the Oregon Constitution? By the time this case was appealed, the 1997 Legislature had made further changes in

the school funding scheme due to the voter-initiated Measure 47 and the legislatively created Measure 50. Undoubtedly, 1999 legislation also affects school funding. The parties make various arguments and have included legislative history on appeal concerning the nature of the 1997 legislative actions and how they have affected school funding. We do not find those materials to be pertinent to the question before us because this case concerns only the constitutionality of the 1995 legislative changes.

As an initial matter, we address the state's argument that Article I, section 20, does not apply to these plaintiffs' claims because plaintiffs are not members of a "true class." As noted, we assumed without deciding in our previous decision that plaintiffs were members of a "true class" for Article I, section 20, purposes. The state urges us to conclude in the present appeal that the 1995 legislation at issue here does not distinguish on the basis of a "true class" and therefore is not susceptible to an Article I, section 20, challenge. The state acknowledges that we have recognized that distinctions made on the basis of geography are cognizable under Article I, section 20, and are evaluated under the "rational basis" test. The state contends, however, that the distinction here is not a geographical distinction based on where the districts are located but is a distinction based on the historic level of funding in specific districts.

In order to make an Article I, section 20, equal privileges and immunities challenge to a statute, a plaintiff must show:

> "(1) that another group has been granted a 'privilege' or 'immunity' which [plaintiff's] group has not been granted, (2) that [the statute at issue] discriminates against a 'true class' on the basis of characteristics which [the class has] apart from that statute * * *, and (3) that the distinction between the classes is either impermissibly based on persons' immutable characteristics, which reflect 'invidious' social or political premises, or has no rational foundation in light of the state's purpose." *Jungen v. State*, 94 Or App 101, 105, 764 P2d 938 (1988), *rev den* 307 Or 658, *cert den* 493 US 933 (1989) (citations omitted).

A class is not a "true class" for purposes of an Article I, section 20, analysis if it is based on a distinction that is "created by the challenged law or government action itself." *Tanner v. OHSU*, 157 Or App 502, 520, 971 P2d 435 (1998) (summarizing case law). True classes based on *ad hominem* personal characteristics are generally subject to a heightened level of scrutiny, *id.* at 521, while other true classes, such as those based on geographical distinctions, will survive an Article I, section 20, challenge if the legislature had a rational basis for distinguishing between the classes involved. It is beyond dispute that "true classes" may be based on geographical or residency distinctions. *See id.* at 521; *Seto v. Tri-County Metro Transportation Dist.*, 311 Or 456, 814 P2d 1060 (1991) (geographic classification reviewed for rational basis); *State v. Scott*, 96 Or App 451, 733 P2d 394 (1989) (same).

■ . We disagree with the state's proposition that legislative distinctions between school districts in terms of their funding are not "geographical" distinctions. School district boundaries are geographical boundaries. Moreover, the boundaries that plaintiffs challenge in this action are not boundaries created by the 1995 legislation. The flaw in the state's argument is that it is confusing *how* the distinction is made with *why* the distinction is made. *How* the school funding is distributed is based on geographical distinctions because it is distributed by school districts that are defined by geographical boundaries. *Why* the legislature has chosen to allocate more school funds to school districts in one location than in another location may be relevant to whether the distinction has a rational basis, but it is not the distinction itself; the distinction is that children within the boundaries of certain school districts go to schools that receive less funding than children within the boundaries of other school districts. That is a geographical distinction.[5]

■ Next, the state argues that plaintiffs are not members of a true class because they "retain the ability to bring themselves in or out of what they perceive to be the favored or

---

[5] It is, in fact, difficult to envision a legislative distinction based on geography that does not have some sort of rationale other than simply distinguishing based on geography. *See, e.g., Seto v. Tri-County Metro Transportation Dist.*, 311 Or 456, 814 P2d 1060 (1991) (reason for geographic distinction concerned light-rail funding).

disfavored class," simply by moving into wealthier school districts. *See generally State ex rel Huddleston v. Sawyer*, 324 Or 597, 610-11, 932 P2d 1145 (1997) (criminal defendant's equal privileges and immunities argument concerning distinctions based on criminal history failed because plaintiff "had the opportunity to remain in the allegedly favored class by obeying the law"); *State v. Clark*, 291 Or 231, 240, 640 P2d 810, *cert den* 454 US 1084 (1981) (a privileges and immunities challenge will not succeed if the law leaves it open to anyone to bring himself or herself within the favored class on equal terms).

It is true that the courts have not recognized "true classes" for purposes of equal privileges and immunities analysis where the plaintiffs are free to bring themselves within the favored class. However, this court has never gone so far as to suggest that the abstract theoretical proposition that a person is free to move from a slum in one location to a mansion in another location defeats all possible "true classes" that are based on geographical distinctions. Unlike those who choose to engage in criminal acts, as in *Huddleston*, children do not *choose* to be born into families that reside in poorer school districts. The plaintiffs in this case all are school children who, aside from the economic impossibility of what the state suggests, are not free to choose where they live because they are minors. We reject without further discussion the state's suggestion that plaintiff children are not a "true class" because they are free to move into school districts that receive more state funding for schools. We conclude that plaintiffs are members of a "true class" for purposes of Article I, section 20, of the Oregon Constitution.

■ The next question is whether the geographical distinction drawn by the 1995 legislation at issue here has a rational basis.[6] Plaintiffs argue, and the trial court agreed, that the only reason the transitional funding scheme was deemed to have passed the rational basis test in our previous decision in this case was that the state indicated that the disparity in funding would be cured in the following biennium.

---

[6] Plaintiffs make no argument that any type of heightened scrutiny is required.

■ To survive an equal privileges and immunities challenge under the rational basis test, the classification involved must bear some rational relationship to some legitimate end. Here, the ends sought by the legislature are not in dispute—the 1995 legislation at issue was designed to move the state toward the goal of funding equality as expressed in ORS 327.013, while at the same time cushioning the impact that the shift to equality in funding would have on districts that historically had spent more money on schools. Plaintiffs argue, in essence, that the legislature's goal of seeking funding equality is legitimate but that its desire to attain that goal without inflicting major cutbacks on certain schools is not legitimate. We disagree. We recognized in our previous opinion that "it is rational for the legislature to have concluded that immediate and drastic cuts in school district funding would have a direct and deleterious effect on the school children in those districts." *Withers*, 133 Or App at 387.

This is not a situation where the legislature chose to set aside its first goal—of achieving funding equality—in order to satisfy its second goal of refraining from inflicting sudden and dramatic funding cuts on certain school districts. Were that the case, plaintiffs would have a very good claim under Article I, section 20. This case, however, concerns the *pace* at which the legislature moved toward its goal of funding equality.[7] The legislature chose to enact legislation that moved it toward *both* goals: working toward funding equality and, at the same time, refraining from inflicting drastic funding cuts on school districts. We reiterate what we said on this topic in our previous decision:

> "[T]he question becomes whether it is better policy to implement incrementally funding equalization to avoid harming students in some districts than to require immediate funding equalization to benefit students in other districts. That is precisely the sort of public policy choice the legislature is constitutionally empowered to make and which we are in no position to second-guess." *Id.* at 387.

---

[7] Again, it bears emphasis that we only are addressing the law that was in effect from 1995 to 1997. We express no opinion as to the constitutionality of subsequent legislation pertaining to school funding.

That is as true of the 1995 legislation at issue in this appeal as it was of the earlier transition funding formula at issue in our previous case. That the legislature did not fully achieve its goal of funding equality by 1995 is unfortunate; however, it is not unconstitutional. We reiterate an apt statement made by the Oregon Supreme Court on several occasions:

> " 'Our decision should not be interpreted to mean that we are of the opinion that the Oregon system of school financing is politically or educationally desirable. Our only role is to pass upon its constitutionality.' " *Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 312, 811 P2d 116 (1991), *quoting Olsen v. State ex rel Johnson*, 276 Or 9, 27, 554 P2d 139 (1976).

The trial court erred in concluding that Or Laws 1995, chapter 649, was unconstitutional.

Reversed on appeal; affirmed on cross-appeal.

**HASELTON, J.,** concurring.

I do not join in the majority's holding that plaintiffs were members of a "true class" for purpose of Article I, section 20, of the Oregon Constitution, *see* 163 Or App at 305-08, and express no view as to that matter.

The question of whether the 1995 school funding legislation does, in fact, distinguish on the basis of geography, as opposed to other considerations, is close and difficult.[1] Here, as in *Withers I, see* 133 Or App at 386, there is no need, practically or legally, to resolve that question. Whatever the statutory differentiations in funding, they are rational. *See* 163 Or App at 308-10.

---

[1] The state argues, for example:

"[I]t is possible, as plaintiffs would have the court do, to describe the factors that cause some districts to get more or less funding under the present law as a function of geography. * * * [H]owever, what distinguishes higher-funded districts from lower-funded ones is not where they sit on the ground, but how much the district historically taxed itself on a per-pupil basis for schools. The current funding ratios simply are not the product of geography."

A hypothetical highlights the difficulty of the "true class" question: The legislature enacts a statute that provides that districts in which more than 70 percent of the students exceed certain performance standards will receive enhanced funding. Does such a funding mechanism distinguish on the basis of geography?

The "true class" answer can, and should, await another day.[2]

---

[2] Query further whether even explicit geographic differentiations in state funding *should ever* be deemed to embody "true classes." Another hypothetical:

> The legislature approves funding for an opera house in Corvallis. Citizens of Albany challenge that appropriation as violating Article I, section 20. There is no "rational" basis for that legislation—indeed, Albany is demonstrably superior. Corvallis just happened to have the votes, and Albany didn't.

Does that legislation violate the constitution as "irrationally" differentiating in the distribution of government benefits on the basis of geography? Or is such legislation merely the inevitable—and ultimately "nonjusticiable"—product of the political process?