Argued and submitted May 1, judgment modified and, as modified, affirmed
August 22, 2007

## ADVANCED DRAINAGE SYSTEMS, INC.,
### a Delaware corporation,
*Plaintiff-Appellant,*

*v.*

## CITY OF PORTLAND, OREGON,
### an Oregon municipal corporation,
*Defendant-Respondent.*

### Multnomah County Circuit Court
### 040505306; A128953

166 P3d 580

Michael H. Simon argued the cause for appellant. With him on the briefs were Julia E. Markley and Perkins Coie LLP.

Ruth M. Spetter, Senior Deputy City Attorney, argued the cause for respondent. With her on the brief was the Office of the City Attorney.

Before Schuman, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Plaintiff, a corporation that manufactures a product called corrugated high density polyethylene pipe (C-HDPE), brought this action against the City of Portland seeking a declaration that the city's refusal to authorize the use of C-HDPE for its storm sewers violated plaintiff's right to equal treatment under the Oregon and United States constitutions, and also seeking to enjoin the city from continuing that refusal. The city counterclaimed, seeking a declaration that it had complete discretion to choose what products to authorize for use on its construction sites. The city then moved for summary judgment to that effect. The court granted the city's motion and entered a general judgment declaring that the city had "complete discretion" to choose what materials to authorize. Plaintiff appeals. We hold that the city did not violate plaintiff's state or federal constitutional rights to equal treatment, but that the declaration that the city has "complete discretion" is overbroad. We therefore modify the judgment and affirm it as modified.

The relevant facts are simple and undisputed. The city has duly promulgated ordinances requiring that "[a]ll * * * materials used for either a local or public improvement * * * shall conform" to certain specified "Standard Specifications." Portland City Code (PCC) 17.16.010(A). The Standard Specifications permit the use of reinforced concrete pipe and solid wall HDPE, but not C-HDPE, for storm sewers. On several occasions, most recently on March 16, 2004, the city rejected plaintiff's request to modify the Standard Specifications so as to permit the use of C-HDPE for storm sewers. Plaintiff then brought this action seeking a declaration that "the City deprived [plaintiff] of equal protection of laws, in violation of the Fourteenth Amendment of the United States Constitution" and "the privileges and immunities clause of the Oregon Constitution, Article I, section 20." Plaintiff also sought a declaration that it was "entitled to approval of [its] corrugated HDPE pipe, for inclusion in the City's Standard Specifications," as well as an injunction for appropriate relief. The city, as noted above, answered and counterclaimed. The trial court granted the city's subsequent motion for summary judgment, declaring that "the City has complete discretion to

decide what products to select for use on its construction projects and what products to include in its Standard Specifications in regard to corrugated HDPE pipe."

■ ■ Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

The text of this section presents an obvious, important, but as yet unresolved threshold question: Is a business corporation a "citizen" that can claim entitlement to equal privileges and immunities under Article I, section 20? Because the parties did not address that issue in their initial briefs, we asked them to submit supplemental briefs responding to the following questions:

"1. Is plaintiff, as a corporation, a 'citizen' for purposes of Article I, section 20, of the Oregon Constitution? *See Northwest Advancement, Inc. v. State, Bureau of Labor, Wage and Hour Div.*, 96 Or App 133, 142 n.7, 772 P2d 934 (1989) [noting but not resolving the issue], and cases cited therein.

"2. Was the issue identified in question 1 raised at trial?

"3. If not, do we have discretion to reach it on appeal?"

The parties' briefing reveals that the applicability of Article I, section 20, to corporations is a complex and interesting question. The text is inconclusive, the case law is inconsistent, and the history, like most history, tells at least two stories. It is a question, however, that must remain unresolved for the present. The parties agree that the issue was not raised at trial, and, although they also agree that we have discretion to reach it on appeal, we conclude that we do not.

Because the city never argued below that plaintiff, as a corporation, could not avail itself of the protections afforded by Article I, section 20, we could decide that question only under two circumstances: if the trial court's implicit conclusion that plaintiff *could* seek the protection of that article were plain error, ORAP 5.45; *State v. Wyatt*, 331 Or 335,

346, 15 P3d 22 (2000), or if the issue implicated the case's justiciability, *Coast Range Conifers v. Board of Forestry*, 192 Or App 126, 128, 83 P3d 966 (2004), *rev'd on other grounds*, 339 Or 136, 117 P3d 990 (2005).

■■■ An error is plain if, among other things, its erroneousness is not reasonably in dispute. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). That is obviously not the case here. Nor does the case raise a question of justiciability. The city suggests that it does, because the question whether plaintiff can avail itself of Article I, section 20, is a question of standing, standing is an aspect of justiciability, and justiciability can be raised at any time. *Yancy v. Shatzer*, 337 Or 345, 349, 97 P3d 1161 (2004) (standing is an issue of justiciability); *Beck v. City of Portland*, 202 Or App 360, 366, 122 P3d 131 (2005) (questions of justiciability may be raised at any time). That theory, however, conflates two distinct meanings of the term "standing." The term is sometimes used (imprecisely) to refer to the question whether a particular plaintiff falls within the ambit of a statutory, constitutional, or contractual provision. Such situations raise issues of interpretation, not issues of justiciability. More properly, "standing" as an aspect of justiciability refers to the question whether the plaintiff will be substantially and practically affected by a decision in the case; if not, then the plaintiff has no "standing," that is, no right to ask the court to decide the issue in the first instance. *Gortmaker v. Seaton*, 252 Or 440, 443, 450 P2d 547 (1969). A case will be nonjusticiable due to lack of standing if the plaintiff has merely an abstract interest in the correct application of the law. *Budget Rent-A-Car v. Multnomah Co.*, 287 Or 93, 95, 597 P2d 1232 (1979). Put another way, a plaintiff has "standing" in one (imprecise) sense to ask the court to determine whether he or she is entitled to relief but lacks "standing" for purposes of justiciability if the only relief the court could provide would not substantially and practically benefit him or her.

Here, plaintiff may or may not have "standing" under the first definition. But because a decision in the case would have a direct and practical effect on plaintiff's legal rights and duties, plaintiff clearly has "standing" for purposes of justiciability. Thus, the issue that the parties did not raise below—whether plaintiff can claim the protection of

Article I, section 20—is a question of constitutional interpretation and not an issue of justiciability, and we therefore cannot address it on that ground.

■     We presume without deciding, then, that plaintiff is within the class of entities that has the right to equal privileges and immunities under Article I, section 20. The question is whether the city's ordinance violated that right. We conclude that it did not.

Article I, section 20, prohibits discrimination against "citizens" individually as well as "class[es] of citizens." In other words, the clause

> "may be invoked by an individual who demands equality of treatment with other individuals as well as by one who demands equal privileges or immunities for a class to which he or she belongs. Because constitutional attacks under Article I, section 20 mostly have been directed at laws prescribing general rules for one or another class of subjects, these attacks, as well as most judicial opinions, have been phrased in the rhetoric of forbidden 'classification,' but that is only one of two distinct grounds of attack. A classic example of the other, individual, basis is *Altschul v. State*, 72 Or 591, 144 P 124 (1914), which invalidated a law permitting a named person to sue the state."

*State v. Clark*, 291 Or 231, 237, 630 P2d 810, *cert den*, 454 US 1084 (1981). Although plaintiff argues that the city has engaged in both types of forbidden discrimination, the facts implicate only the class-based type. Plaintiff's claim is that the city engages in a forbidden form of discrimination by categorically imposing a burden on all members of a particular class: manufacturers of C-HDPE. An alternate formulation of the claim is that the city grants a privilege to some classes of sewer pipe manufacturers (HDPE, concrete) that it does not give to members of the class of which plaintiff is a part (C-HDPE). Plaintiff does not claim to have been singled out from all pipe manufacturers (including other manufacturers of C-HPDE) on some basis unrelated to any class to which it belongs.

■     The appropriate standard for reviewing class discrimination depends on the type of class at issue. A so-called "class" that consists of members who would not be considered

as belonging to a distinctive group except for the very government action that is being challenged is not, in fact, a "class" for purposes of Article I, section 20, and such "classifications" do not constitute unlawful discrimination. *Clark*, 291 Or at 240; *Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435, *cert den*, 498 US 819 (1990). Thus, for example, the state does not violate Article I, section 20, by imposing a burden on litigants who do not meet filing deadlines, because late filers would not be considered a distinctive group if it were not for the law that imposes the very deadlines being challenged. A "true class," on the other hand, is one whose members have in common some "antecedent personal or social characteristics or societal status." *Hale v. Port of Portland*, 308 Or 508, 525, 783 P2d 506 (1989). A system that distributes privileges or immunities based on membership in a "true" class is subjected to a demanding level of judicial scrutiny if it is "based on immutable traits or traits on the basis of which class members are subjected to adverse social or political stereotyping or prejudice." *Cox v. State of Oregon*, 191 Or App 1, 9, 80 P3d 514 (2003) (Schuman, J., concurring). The classic example is race. Other true classification systems survive if they are "rational." *Id.*

Plaintiff does not claim that the classification system under which the city favors some classes of sewer pipe manufacturers over others must be subjected to a heightened or demanding level of judicial scrutiny; it claims, rather, that we must examine the classification (and consequent denial of privileges) for rationality. The city argues that the Standard Specifications do not implicate Article I, section 20, at all. According to the city, "manufacturers of C-HDPE" are a group that would not exist *as a group* whose members regard themselves, and who are regarded by society at large, as such, were it not for the distinction created by the Standard Specifications themselves.

We need not resolve that dispute, however, because, even if plaintiff is correct and the city's classification system must pass "rationality review," it does so. A concurring opinion from this court discusses that standard:

"Because it derives from federal law, *Hale*, 308 Or at 524, definitions [of rationality review] from United States

Supreme Court cases are instructive. Over the years, that Court has used a variety of verbal formulations to describe the test. What they reduce to is nearly total deference to legislative classifications. Since the New Deal, the number of times the Court has struck down statutes because they fail rationality review can probably be counted on the fingers of one hand, and in most of those cases the classification, while not one of the very few labeled 'suspicious,' discriminated against some easily identified, historically disadvantaged group. *See, e.g., City of Cleburne v. Cleburne Living Center,* 473 US 432, 105 S Ct 3249, 87 L Ed 2d 313 (1985) (striking down discrimination against mentally disabled using rational basis test); *Plyler v. Doe,* 457 US 202, 102 S Ct 2382, 72 L Ed 2d 786 (1982) (striking down discrimination against children of undocumented aliens using rational basis test).

"The language of deference takes many forms. One of the most frequently cited formulations announces that a law will pass rationality review if 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.' *United States v. Carolene Products Co.,* 304 US 144, 154, 58 S Ct 778, 82 L Ed 1234 (1938); *see also Minnesota v. Clover Leaf Creamery Co.,* 449 US 456, 101 S Ct 715, 66 L Ed 2d 659 (1981). The 'debatable' proposition need not have been, in fact, debated in the legislature. As the Court has specifically held on several occasions, '[i]t is, of course, "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision," * * * because this Court has never insisted that a legislative body articulate its reasons for enacting a statute.' *U.S. Railroad Retirement Board v. Fritz,* 449 US 166, 179, 101 S Ct 453, 77 L Ed 2d 368 (1980) (quoting *Flemming v. Nestor,* 363 US 603, 612, 80 S Ct 1367, 4 L Ed 2d 1435 (1960)).

"Further, a statute that only partially attacks an identifiable evil * * * is not an irrational method of accomplishing a legislative objective. In *Railway Express Agency v. New York,* 336 US 106, 69 S Ct 463, 93 L Ed 533 (1949), the Court sustained an ordinance prohibiting advertising on some trucks, but not others, on the theory that visual distraction could lead to traffic accidents. To the argument that this law irrationally singled out a particular group even though distraction was equally caused by other similar advertisements, the Court responded: 'It is no requirement of equal protection that all evils of the same genus be

eradicated or none at all.' *Id.* at 110. On the same theme, the Court sustained an Oklahoma statute that created an allegedly irrational distinction between opticians who dispensed ready-to-wear glasses and other opticians. The Court held:

> " 'Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting others.'
>
> *"Williamson v. Lee Optical*, 348 US 483, 489, 75 S Ct 461, 99 L Ed 563 (1955) (citations omitted); *accord F.C.C. v. Beach Communications, Inc.*, 508 US 307, 316, 113 S Ct 2096, 124 L Ed 2d 211 (1993)."

*Cox,* 191 Or App at 14-16 (Schuman, J., concurring).

The Oregon Supreme Court also has adopted this extremely inclusive definition of "rationality." In *State v. Pyle*, 226 Or 485, 360 P2d 626 (1961), the defendant argued that a statute providing special privileges to trucks that transported logs, poles, or piling violated state and federal constitutional guarantees. In rejecting that argument, the court, citing *Williamson* and *Railway Express* among other cases, observed:

> "The reasons for selecting this one class of commodities for special treatment are not explicitly stated in the statutes. But that is no obstacle in sustaining the legislation if there is any rational basis for such special treatment. * * *
>
> "The special treatment afforded the haulers of logs, poles or piling could be justified here if only on the ground that the legislature desired to foster the logging industry through the special benefits afforded to those hauling the raw products of the forests. * * * It is within the power of the legislature to grant special benefits to one branch of industry in order to promote the public good."

*Pyle*, 226 Or at 490. The court went on to suggest a number of other reasons "which might have prompted the legislature to permit those hauling logs, poles and piling to carry heavier loads." *Id.* at 491. *See also Crocker and Crocker*, 332 Or 42,

55, 22 P3d 759 (2001) (sustaining legislative classification based on what a "legislator rationally could believe"). The lesson to be drawn from these state and federal cases is that a legislative or quasi-legislative enactment (as opposed to a judicial or quasi-judicial determination) will survive judicial review for "rationality" if the court can itself think of some sense in which the enactment promotes, even marginally, *any* legitimate governmental interest, even if there might be equally good or better ways to advance it.

Under that rule, the city's ordinance containing the Standard Specifications does not violate Article I, section 20. Indeed, the case is not even close. A rational person could believe that C-HDPE is not as safe or durable as other types of sewer pipe, or that limiting the types of pipe would allow for more efficient maintenance. Even if there were no evidence in the record to support that belief, the absence would not permit invalidation. *Pyle*, 226 Or at 489-90. However, there is such evidence. For example, the chief engineer of the city's Bureau of Environmental Services (BES) testified,

> "I am aware that other government entities approve the use of corrugated HDPE pipe. However, at this time I have declined to do so. Reinforced concrete pipe has worked well for the City of Portland since the early part of the 20th century. In general, BES expects its concrete pipe to perform well for up to 50 to 75 years after installation. I have concerns about the use of [plaintiff's] pipe and a responsibility to ensure that BES projects perform well.

> "In contrast to the long use of reinforced concrete pipe, corrugated HDPE pipe is a relatively new product, which according to ADS, was first introduced to the public works construction market for storm sewer use in the late 1980s. Although ADS contends its corrugated HDPE pipe will have as long a life span and works just as well as reinforced concrete pipe, the actual history of its use has been relatively recent and is much shorter than the City's anticipated time line."

Another witness testified that a neighboring jurisdiction "didn't want to add another type of pipe to their specifications. They didn't want their bureau of maintenance to have—to fix several different types of pipe."

In short, the city's Standard Specifications are rational as that term is used in Article I, section 20, jurisprudence.[1] They therefore do not violate plaintiff's right to equal privileges and immunities. Because, as noted, Oregon's use of rationality review derives from federal cases under the Equal Protection Clause of the Fourteenth Amendment, the Specification Standards are permissible also under federal law. The trial court did not err in so concluding.

■ Plaintiff is correct, however, in asserting that the trial court's judgment is too broad. The judgment states that the city "is entitled to a declaration that the City has complete discretion to decide what products to select for use on its construction projects and what products to include in its Standard Specifications in regard to corrugated HDPE pipe." As discussed, the city does not have "complete discretion." Its standards must be "rational." Further, although we cannot imagine that the city would want to do so, it would not have discretion to permit products manufactured only by, for example, Catholics or Norwegians. The state and federal constitutions, in other words, impose some limitations on the city's choices. The judgment should be modified to state that "the City's decision not to include plaintiff's corrugated HDPE pipe in its Standard Specifications does not violate plaintiff's rights under the Oregon or United States constitutions."

Judgment modified and, as modified, affirmed.

---

[1] "This default 'rational relationship' test for ordinary discrimination crept into Article I, section 20, case law in *Seto* [*v. Tri-County Metro. Transportation Dist.*], 311 Or 456, [814 P2d 1060 (1991),] despite the fact that two years earlier, in *Hale*, the court said that the 'rational basis' test came from federal law and 'has been superseded by our more recent [Article I, section 20] decisions.' 308 Or at 524. *Seto* cites *Sealey* and *Clark*, but neither of those cases adopts anything like a 'rational basis' test. *Seto*, 311 [Or] at 467. In fact, nothing in Oregon case law before *Seto* required ordinary classifications to be any more 'rational' than any other kind of statute, which is to say, not rational at all. Regardless, for better or for worse, the test now appears to be a well-settled part of Oregon equality law."

*Cox*, 191 Or App at 12 n 5 (Schuman, J., concurring).